# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS
### FAYETTEVILLE DIVISION

**JASON DUANE EMERY**                                                      **PLAINTIFF**

**V.**                                      **CASE NO.: 5:16-CV-05193**

**SHERIFF HELDER, Washington
County, Arkansas; MAJOR DENZER;
LIEUTENANT FOSTER; SERGEANT
STANTON; SERGEANT MORSE;
SERGEANT ARNOLD; ARAMARK
CORRECTIONAL SERVICES, LLC;
TOMMY ROARK; TINA WEBB;
JESSIE ENGLAND; CORPORAL CARLA
CINK; BILLY WILLIS; CHARLES
DOMINGUEZ; R. WALKER; DR. KARAS;
NURSE LANDON HARRIS; CORPORAL
CAUDLE; CORPORAL WORKMAN;
NURSE KRISTEN NICHOLS; CORPORAL
MULVANEY; DEPUTY J. VELASCO;
LIEUTENANT REESER; and
SERGEANT AKE**                                                          **DEFENDANTS**

## MEMORANDUM OPINION AND ORDER

This is a civil rights action in which Plaintiff Jason Duane Emery is proceeding *pro se* and *in forma pauperis.* Plaintiff is currently incarcerated in the Wrightsville Unit of the Arkansas Department of Correction ("ADC"). At all times relevant to this Complaint, he was incarcerated in the Washington County Detention Center ("WCDC").

Plaintiff contends his constitutional rights were violated at the WCDC in the following ways: (1) he was not provided with an adequate diet, and the method in which the jail transported the food to the prisoners was substandard; (2) the commissary charged exorbitant prices; (3) he was denied access to the courts; (4) the grievance procedure was inadequate; (5) he was denied access to newspapers or other media containing local, state, or world news; (6) the classification system denied him Equal Protection; and (7) he

was denied adequate medical care. Plaintiff also brings a supplemental state law claim under the Arkansas Deceptive Trade Practices Act ("ADTPA") based on the operation of the commissary.[1]

The case is before the Court on two motions for summary judgment. The first is a Motion for Summary Judgment filed on behalf of Aramark Correctional Services, LLC ("Aramark"), and its employees, Tommy Roark, Tina Webb, Jessie England, and Carla Cink (collectively, the "Aramark Defendants"). See Doc. 88. Plaintiff filed a Response in opposition to this Motion. See Doc. 125. The second Motion for Summary Judgment was filed on behalf of Sheriff Helder, Major Denzer, Lieutenant Foster, Sergeant Stanton, Sergeant Morse, Sergeant Arnold, R. Walker, Dr. Karas, Nurse Landon Harris, Corporal Caudle, Corporal Workman, Nurse Kristen Nichols, Corporal Mulvaney, Deputy J. Velasco, Lieutenant Reeser, and Sergeant Ake (collectively, the "Washington County Defendants").[2] See Doc. 97. Plaintiff also filed a Response to the second Motion for Summary Judgment. See Doc. 122. For the reasons explained herein, the Aramark Defendants' Motion is

---

[1] In his brief in support of his response, Plaintiff indicates he desires to dismiss the following claims: (1) his claims based on alleged violations of his rights by the use of, and positioning of, a video visitation system; (2) alleged violations of the Health Insurance Portability and Accountability Act ("HIPPA"); (3) alleged violations of his rights by the mail system utilized at the jail; and (4) alleged "risk of harm" claims. (Doc. 123, pp. 5-6, 8, 12). The "risk of harm" claims include: being housed in a cell without an intercom; removal of the non-slip or skid strip from the stairs; the failure to paint the strips caution yellow or orange; the failure to correct the over-spray of the shower or to use a wet floor sign; and the use of transport vans without safety equipment. Id.; see also Amended Complaint (Doc. 38). These claims will therefore not be addressed.

[2] Defendants Reeser and Ake were added to the case after the Washington County Defendants filed their Motion for Summary Judgment. However, these two Defendants simply joined in the original Motion and advised the Court that they did not need time to file a supplement. See Doc. 110.

**GRANTED**, and the Washington County Defendants' Motion is **GRANTED IN PART AND DENIED IN PART**.

## I. BACKGROUND

Plaintiff was booked into the WCDC on June 24, 2016. (Doc. 99-2, p. 1). At that time, he was 6'1" and weighed 242 pounds. *Id*. at 2. According to the intake sheet, he stated that he was currently taking the blood pressure medications Amlodipine, Minoxidil, and Lisinopril, as well as a pain medication called Tramadol. *Id*. He did not have the medications with him at the time of booking. He further reported that the last time he was seen by a doctor was in Eureka Springs approximately two months prior. Plaintiff also alleged that he had suffered past injuries to his neck, back, knee, and shoulder. Also at the time of booking, he admitted to being addicted to methamphetamine and using the drug daily. (Doc. 99-3, p. 2).

Once incarcerated at the WCDC, Plaintiff began receiving regular meals, three times per day. "Arkansas Jail Standards, Section 11-1001, require the minimum daily calorie level for sedentary inmates shall be 2300 calories and the minimum calories for active inmates shall be 2700 calories." (Doc. 99-1, p. 3); *see also* Doc.100-1, p. 1. Aramark contracts with Washington County to provide all food and commissary services at the WCDC. No WCDC employee "is qualified to manage the caloric values of the menu plans." (Doc. 99-1, p. 3). Further, Aramark is not required to consult any WCDC employee in the planning or preparation of the meals served in the WCDC.

Defendants Tommy Roark, Tina Webb, Jessie England, and Carla Cink are Aramark employees who were assigned to work at the WCDC during the relevant time.

3

The Aramark dietician responsible for the inmate menu was Kate Crowley, MPH, RD, LDN. She has a master's degree in public health, and she is both a registered dietician and a licensed dietician/nutritionist. (Doc. 90-2, p. 1). According to Crowley, the menu at the WCDC is periodically reviewed to ensure that all meals are nutritionally balanced and meet caloric requirements sufficient to sustain good health. The menu is also approved by Washington County.

Crowley affirms that the regular inmate menu meets the guidelines of the American Correctional Association and the Food and Nutrition Board of the Institute of Medicine, National Academy of Sciences, dietary guidelines for adults aged 19 to 50. *See id.* at 2. She maintains that the meals served each day total approximately 3000 calories, which exceeds the current daily recommended intake for an adult aged 19 to 50. According to Crowley, all meals served to Plaintiff were in compliance with the 28-day meal plan approved at the WCDC. *Id.* at pp. 3, 5. The WCDC follows the meal plan without regard to when commissary orders are placed or delivered. Moreover, Crowley claims that when setting, reviewing, or approving the menu at the WCDC, she is unaware of which days, if any, that commissary orders are placed or delivered. *Id.* at 3. Aramark employees oversee the preparation of meals at the WCDC, and specific utensils are used to ensure that a full serving of each food item is easily and precisely measured. *See* Doc. 90-2 at 2.

Defendant Carla Cink is Food Service Director for Aramark. She manages the kitchen and inmate meals at the WCDC. Cink asserts in her affidavit that all meals served to Plaintiff were in accordance with official Aramark policy which required that the meals

4

be prepared pursuant to the guidelines established by the dietician. *See* Doc. 90-3, p. 1. The WCDC makes a daily request for a specific number of each type of meal, such as a regular meal, a vegetarian, or a diabetic meal. *Id.* at 2. Cink further affirms that Aramark's services are subject to the oversight of the Criminal Detention Facilities Review Committee of the Arkansas Department of Finance and Administration. *Id.*

Plaintiff's Complaint includes allegations about the inadequacy of the food served at the WCDC. He testified in his deposition that he weighed 244 pounds[3] when booked into the WCDC on June 24, 2016. *See* Doc. 90-1, p. 9. He asserted that approximately a month and a half later, he was down to 234 pounds,[4] and he also believed he had lost muscle mass.[5] *Id.* at 9-10. He stated during his deposition on August 19, 2016, that his weight had been measured the previous day, and he had weighed 234 pounds. *Id.* at 9. Prior to his incarceration, Plaintiff believed he was eating more than 3,000 calories per day. *Id.* at 21. In his opinion, 2,500 calories per day is the "minimum . . . for a person to survive." *Id.*

Plaintiff also testified in his deposition that on commissary-order days, inmates usually received less food on their meal trays—for example, just one sandwich instead of

---

[3] As noted above, the booking records indicate his weight was 242 pounds. (Doc. 99-2, pp. 1-2).

[4] Madison County booking records dated July 11, 2016, list Plaintiff's weight as 245 pounds. (Doc. 99-2 at 17).

[5] Subsequent to the filing of this case, Plaintiff continued to complain about weight loss. (Doc. 90-4). For example, on October 8, 2016, Plaintiff stated in a grievance to WCDC officials that he had "lost over 30 lbs in 3 months." *Id.* In his Amended Complaint filed on October 13, 2016, he alleged he had lost over twenty-five pounds while at the WCDC. *See* Doc. 38, p. 3.

two. *Id.* at 10. Plaintiff believed that WCDC/Aramark placed less food on the trays intentionally, in order to induce inmates to order more commissary products. *Id.* Inmates were permitted to order from the commissary only one day per week, usually on Saturdays, and inmates would receive their commissary orders on Mondays. *Id.* Plaintiff testified that he would typically order ramen noodles from the commissary because they "had some type of substance" to them. *Id.* at 14.

Plaintiff contends the Aramark and Washington County Defendants violated the ADTPA based on the high prices they charged for commissary items. He believes Defendants engage in price gouging. He also contends the food portions at the ADC are "much larger" than at the WCDC. *Id.* According to Plaintiff, the inmates at the WCDC were constantly hungry or "starving at all times, because we are not fed good." (Doc. 90-1, p. 11); *see also* Doc. 99-5, p. 20. Plaintiff testified that being hungry causes one to be more irritable and aggressive and that hunger was "the worst torture a person can go through in most cases." (Doc. 90-1, p. 16).

He agreed that WCDC inmates receive three meals a day, with a typical breakfast consisting of a biscuit and gravy, oatmeal or grits, eggs, and milk or juice. *Id.* at 11. Plaintiff described a typical lunch tray as consisting of two sandwiches, some iceberg lettuce and cake or a cookie. He described dinner trays as typically including some rice or "meat-type deal," iceberg lettuce, a vegetable such as carrots or green beans, and cake or a cookie. *Id.* at 12. But on commissary-order days, Plaintiff testified that the dinner tray was usually missing one item—typically the vegetable. *Id.*

Aside from his complaints about the amount of food served, Plaintiff also takes issue

6

with how the food trays were transported from the kitchen to the pods for service. Once the meals are prepared, they are transported by trustees to the pods and then served. (Doc. 90-3, p. 2). Meals are served in covered trays, stacked in an interlocking fashion on a rolling cart. (Doc. 90-2, p. 2). Plaintiff believes the food should be transported in a "hot box" instead, so that the meals stay warmer. He filed grievances on several occasions, complaining that the food trays were placed in the hallways between the pods and then left there for sometimes more than an hour before service. He contends that this food-service procedure is unsanitary and unsafe for the inmates.

Turning to Plaintiff's official-capacity claims, he believes that since Sheriff Helder was in charge of the facility, he had the ability to step in and order that detainees be provided with more food. Plaintiff admits that he never spoke with Sheriff Helder about the food, though. According to Sheriff Helder's affidavit, he relies upon his "chain of command" to administer the various operations of the jail, pursuant to the WCDC's implemented policies and procedures. See Doc. 99-8, p. 1. Sheriff Helder indicates that, generally, he is "not personally involved unless the problem is systemic or not capable of resolution by [his] staff." Id. at 1-2. With respect to Plaintiff, Sheriff Helder is not particularly surprised that he had no personal knowledge of any of the incidents Plaintiff complained of in this case, since "Plaintiff's allegations deal with day to day decisions and operations in the Detention Center," and Sheriff Helder is not personally involved in those decisions. Id. at 2.

Plaintiff also admits that he never spoke directly with Major Denzer, the Jail Administrator, with regard to his requests and grievances—though Plaintiff did address at least some of those written requests and grievances directly to Major Denzer. Major

7

Denzer confirms in his affidavit that the "Detention Division operates in a chain of command whereby most direct contact with detainees occurs with pod deputies who are tasked with carrying out the routine, day to day operations such as meal delivery, safety functions during transport or medication distribution, or oversight of daily clean up of the facility." (Doc. 99-9, p. 1). The deputies are supervised by a number of persons, including a corporal, sergeant, and one or more lieutenants. Major Denzer further maintains that he is not involved in routine aspects of daily operation of the jail, and he was not familiar with Plaintiff before he filed the instant case. *Id.* at 2.

As for Sergeants Morse, Fuller, Stanton, and Arnold, as well as Lieutenant Foster, they are the WCDC staff members who usually responded in writing to Plaintiff's requests and grievances. With that said, however, Plaintiff admits that these officers never spoke to him in person about his grievances about food quantity or quality, and they were never present when Plaintiff was served his meals. *See* Doc. 90-1, p. 12.

Moving on, Plaintiff's next claim is that he was denied adequate access to a law library. He testified that the WCDC requires inmates to obtain a court order to be transported to a library off site, as the facility does not have its own library. In one of his grievances, Plaintiff indicated that he could not obtain a "court order for such a thing because I couldn[']t talk to [the] judge or public defender at my court hearing. My requests to both offices have gone ignored for a month." (Doc. 99-5, p. 21). He was told by WCDC officials that a court order was necessary to be transported off site, and that he was free to request legal assistance by filling out a form that could be faxed to the public defenders' office. *Id.* Plaintiff believed that the public defender could not help him with his civil rights cases or with filing a motion under Rule 37 of the Arkansas Rules of Criminal Procedure

8

for ineffective assistance of counsel—particularly when Plaintiff was making the argument that a public defender had provided him ineffective assistance. *Id.*

Plaintiff's next claim concerns the amount of paper he was given at the WCDC. When Plaintiff would ask for pieces of paper and envelopes for his legal materials, he was told he had to choose between using the paper for legal work and writing letters home. Plaintiff testified in his deposition that he ran out of paper when doing his legal work. (Doc. 90-1, pp. 24-25). He borrowed paper from other inmates. *Id.* He claims that he did not know anything about deadlines in his various cases and was not "made aware" of any deadlines he had missed. *Id.* at 26. Further, he contends that a civil rights case he filed in this District, *Emery v. Hyslip*, 5:16-CV-05277, was ultimately dismissed because of his lack of knowledge of the law and his lack of resources to pursue claims against certain types of defendants. He believes that his lack of access to legal resources also hampered his ability to address a child custody case he had pending against him, and a civil forfeiture complaint. *See* Doc. 123, p. 8.

With respect to the WCDC's policy on providing paper, Corporal Mulvaney affirms that inmates are provided with "paper, a pencil, and two free envelopes per week . . . ." and that "[n]on-indigent inmates may purchase additional writing materials and postage paid envelopes from commissary." (Doc. 99-1, p. 5). According to the WCDC inmate handbook, detainees are provided "postage, envelopes, and paper for communication with the courts, and two envelopes and ten sheets of paper per week for correspondence of a personal nature." (Doc. 101-1, p. 23).

Plaintiff next maintains that the grievance procedure was inadequate. First, he

contends his rights were violated by the limit placed on the number of grievances/requests a detainee could have "open" on the kiosk at any one time. (Doc. 99-5, p. 18). He argues that his access to the grievance system was being hindered by jail staff not closing his previous grievances. *Id.* He believes some grievances were left open for days, and because of this, jail staff were "blocking my access to the courts and my right to due process." *Id.* Next, he contends that he received inadequate or no responses to some of his grievances. He believed that appealing grievances was useless, and that grievances were not passed up the chain of command, as he expected them to be.

The WCDC grievance policy provides that "[a] grievance shall be made by utilizing the kiosk provided in the cellblock." (Doc. 100-1, p. 9). According to Corporal Mulvaney, the "kiosk system allows a detainee to have up to three open matters at once." (Doc. 99-1, p. 4). Corporal Mulvaney explains in his affidavit that "[t]his is because of the limitations on the system and to prevent abuse by detainees." *Id.* However, he notes that detainees "have regular contact with deputies" and if the "detainee had too many open matters in the electronic system, the detainee may address the problem to a Deputy directly." *Id.* Further, if the kiosk is "down or unavailable," paper grievances are available. *Id.* at 4-5.[6]

Plaintiff's next claim is that he was being denied newspapers, magazines, and meaningful access to news media while in the WCDC. He claims that WCDC staff played the radio, but the broadcast was either music or "campaign radio" with no local, state, or world news. (Doc. 90-1, p. 29). Plaintiff indicated that the radio stations only played

---

[6] The inmate handbook indicates that written requests are to be submitted to a floor deputy, and grievances are to be submitted in a written statement to a shift supervisor. (Doc. 101-1, pp. 30-31). The kiosk system is not mentioned in the inmate handbook.

political news concerning the 2016 Presidential race, and this news was meaningless to him as he could not vote in the election anyway. (Doc. 99-5, p. 22). He claimed he had not seen or heard "anything about local, state, country, or world news since" he had been at the WCDC. *Id.* He noted that other detainees in the WCDC, including trustees and inmates in the work-release pod, were allowed to view the news on television. *Id.* He also claimed that other county jails and the ADC allow inmates to read newspapers. *Id.* He maintains that when he complained about the lack of news at the WCDC, he was told that the facility had been assured by its legal advisor that the "decision to discontinue newspapers in this facility and only use XM Radio[7] as its news source for its detainees . . . [was] within the law and [did] not violate anyone's rights." *Id.*

Corporal Mulvaney responds in his affidavit that the WCDC "provides a subscription to several satellite radio stations which are played during daytime hours and which are intermittently changed." (Doc. 99-1, p. 6). He maintains that these radio stations "provide discussions of news topics and various viewpoints." He agrees, however, that the WCDC discontinued the practice of providing newspapers to the general population, allegedly "[b]ecause of constant problems with damage caused by inmates hoarding newspapers, fighting over them, or using newspapers to clog toilets and start fires . . . ." *Id.*

Plaintiff's next claim concerns the housing classification he was assigned at the WCDC. Plaintiff testified that he was housed on "A side" with all the violent offenders, even though he had never been charged with a violent offense. (Doc. 90-1, p. 32).

---

[7] The summary judgment record contains no further information on what stations or news programs were broadcast in the WCDC at the relevant time period, or the content of those programs.

Although he did not report any threats to his safety, Plaintiff indicated he had asked to be moved "many times to B side where I feel like I'm supposed to be at because I'm not a violent offender." *Id*. at 33. While he could not point to any specific incident, Plaintiff indicated he was sure he had been threatened at some point by other inmates. *Id*. He testified that "tensions are high in these pods at all times . . . ." *Id*.

Plaintiff also testified that he felt that A side was the "punishment pod," since inmates on B side were allowed access to their personal property and were able to get on their bunks during the day, but A side inmates were denied such privileges. Plaintiff does not know who determined his classification, but he pointed out that he had never had a disciplinary incident at the jail or been involved in any sort of altercation. *Id*. at 34. On July 11, 2016, when Plaintiff requested in a written grievance to know his "custody score" and complained that he wished to be housed in "B side," Corporal Caudle's written response was that Plaintiff had been assigned to A side because he was a "medium or maximum," and that "points don't matter." (Doc. 99-5, p. 13). When Plaintiff continued to question his classification status, he was in formed in writing on July 13, 2016, by Lieutenant Foster, that designations were based on:

> an objective classification system which is in accordance with our policy and procedure which is in compliance with State and Federal Law. You initial classification is based upon you[r] criminal history and your curent criminal charge and a few other factors. Because of the classification system you have the opportunity to potentially improve your classification based upon your behavior while in this facility.

*Id*. at 15.

Plaintiff was, in fact, involved in a physical altercation with other inmates on August 20, 2016, after which he was charged with "behavior which is aggressive or disruptive to

12

the facility" and "provoking or agitating a fight." *See* Doc. 102-10. In the written description of the incident, it appears Plaintiff was involved in a fight with four other inmates. Two of the inmates received injuries that required treatment at the nurses' station, but Plaintiff was not among the injured. Just prior to this fight, on February 16, 2016, his status had been officially changed to "minimum" security. *See* Doc. 102-7, p. 1. He believes prior to February 16, he was misclassified as a "medium" or "high" security inmate and assigned to A side.

According to Corporal Mulvaney's affidavit supplied in response to Plaintiff's contentions, the inmate classification system "considers factors such as a detainee's criminal history and pending charges and provides a guideline for placement of the detainee." (Doc. 99-1, p. 5). The staff also considers whether there is "available space" and whether "any persons . . . are known as a threat to or threatened by the detainee . . . ." *Id.* Corporal Mulvaney indicates that A side is generally reserved for detainees on administrative or disciplinary segregation or those classified as "high or medium-high risk inmates." *Id.* at 6. He explains that B side is generally reserved for "low to low-medium risk inmates" and trustees. *Id.*

Plaintiff's next claim is that he was denied adequate medical care while in the WCDC. According to WCDC policy, emergency medical services are available 24 hours a day. (Doc. 99-1, p. 2). "Officers are trained to respond to medical emergencies and may provide temporary lifesaving care while [emergency medical services] or other medical personnel are in route." *Id.* Since January 1, 2016, Dr. Karas has served as the jail's doctor, and Karas Correctional Health has provided all medical care pursuant to a contract

13

with Washington County. *Id.* at 3. Detainees are instructed to submit medical complaints via an electronic kiosk, and the requests are then reviewed by the medical staff. According to Corporal Mulvaney, the WCDC's policy is that "[a]ll matters of judgment regarding health services are made within the sole province of the contract medical staff," and "[a]ll decisions regarding medications, medical testing, or medical treatment are left to the professional medical judgment of the physician at the detention facility." (Doc. 99-1, p. 3) (emphasis omitted).

Plaintiff claims that Dr. Karas and his medical staff provided substandard medical care with respect to Plaintiff's withdrawal and detoxification from methamphetamine, which occurred when he first arrived at the WCDC. Plaintiff also takes issue with the way the medical Defendants administered his blood pressure medications. Plaintiff claims he was diagnosed with high blood pressure during a prior incarceration in the ADC. Following his release, he visited a private doctor and was placed on the drug Amlodipine. He testified in his deposition that he continued having problems with blood pressure, and his doctor increased his dosage of Amlodipine and added a prescription for the drug Lisinopril. After that, his private doctor added the drug Minoxidil, as Plaintiff's blood pressure was still high. Plaintiff testified that for his first week or week-and-a-half at the WCDC, he was not given any blood pressure medication. *See* Doc. 90-1, p. 40. He contends that he provided medical staff with the name of his pharmacy so that they could verify the blood pressure medications he was taking. *Id.* at 41.

According to jail medical records, medical staff did verify Plaintiff's prescriptions for Amlodipine, Lisinopril, and Minoxidil on June 24, 2016—the day he was booked into the jail. Plaintiff's private physician, Dr. House, had prescribed all three medications, and

14

Plaintiff last filled them on June 8, 2016. (Doc. 99-3, p. 5). Plaintiff was then approved by the jail doctor to receive both Amlodipine and Lisinopril on June 24, and Plaintiff started receiving them on June 25, 2016. *Id.* at 8-10. The medication administration records indicate Plaintiff was first given Amlodipine and Lisinopril on June 25, 2016. *Id.* at 57. The records further indicate that he refused these medications on June 28, June 29-30, July 6-7, July 13, and July 28, 2016. *Id.* at 54-56. In addition to Amlodipine and Lisinopril, on July 8, 2016, Plaintiff began receiving Naproxen, an anti-inflammatory painkiller, and on July 27, 2016, he began receiving a nightly dose of Melatonin. *Id.* at 8, 53.

Plaintiff disputes that he was given his blood pressure medication beginning on June 25, despite what the medical logs indicate. *See* Doc. 90-1, p. 42. He claims instead that he had to "argue every day" with the nursing staff for the first week to week-and-a-half he was incarcerated at the WCDC in order to receive his pills. *Id.* He further claims that he did not refuse medication on the dates indicated in the logs, but that his medication was often not on the pill cart. *Id.* at 41, 44. Plaintiff stated that on one occasion, a nurse, whose name he does not recall, indicated that she knew Plaintiff had not been refusing his medication and that he should file a grievance. *Id.* at 41. Plaintiff testified that after this interaction with the nurse, he had no further problems getting his blood pressure medication. *Id.* at 44.

Jail medical records confirm that on June 24, 2016, the day Plaintiff was booked, he submitted a sick-call request regarding, among other things, not having received his blood pressure medications yet. (Doc. 99-3, p. 10). He was added to the sick-call list on June 27, 2016. *Id.* But on June 28, 2016, medical staff made a notation in the logs that

15

Plaintiff would not being seen during sick call that day because the medications he requested were "on med cart." *Id*.

As for his complaint about inadequate medical care given during his detoxification from methamphetamine, Plaintiff testified he was addicted to methamphetamine and would also take Hydrocodone or Percocet. He confirmed that when he was booked into the WCDC, he had been on methamphetamine and opiates for about a year and a half, and that this long period of addiction made his detox period worse than on previous occasions. He testified that he began sweating, felt sick, vomited, had diarrhea, did not feel like eating, was delirious a few times, hallucinated a couple of times, and felt his joints had "locked up." (Doc. 90-1, pp. 45-46, 52). He also told staff that he felt like he was dying and would often sleep on the concrete floor of the pod area, having been administered the drug Naproxen for the "shakes and pain." *Id*. at 42. Instead of being locked out of his jail cell, he would have preferred to stay in his cell while going through detox so he could "rest and sleep and get [his] strength back up." *Id*. at 50.

Jail medical records indicate that Plaintiff was placed on a "detox screen" for five days beginning on June 24, 2016. (Doc. 99-3, p. 9). On June 24, Plaintiff submitted a sick call request complaining that he had neck, back, knee, and shoulder problems, and that he wanted to be able to lie down when he was hurting. *Id*. at 10. He said he had so many injury issues that "there is no way I can sit at a table or stand around all day." *Id*. He did not mention in the grievance any problems associated with detoxifying from methamphetamine.

Plaintiff also testified that he had contact with medical staff twice a day during pill

call. During those times, the nurse would merely ask what his symptoms were. Plaintiff felt he should have also been seen by a doctor and had his blood pressure checked on a regular basis. However, he testified that as of the date of his deposition, August 19, 2016, he felt he was getting "better medical care." (Doc. 90-1, p. 53).

## II. LEGAL STANDARD

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A] genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the disputed fact is material to the outcome of the case; and (3) the dispute is genuine, that is, a reasonable jury could return a verdict for either party." *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.,* 49 F.3d 399, 401 (8th Cir. 1995). The moving party has the burden of showing the absence of a genuine issue of material fact and that they are entitled to judgment as a matter of law, but the nonmoving party may not rest upon mere denials or allegations in the pleadings and must set forth specific facts to raise a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). The Court must view all evidence and inferences in a light most favorable to the nonmoving party. *See McCleary v. ReliaStar Life Ins. Co.,* 682 F.3d 1116, 1119 (8th Cir. 2012). However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a Court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris,* 550 U.S. 372, 380 (2007).

## III. DISCUSSION

Section 1983 provides a federal cause of action for the deprivation, under color of law, of a citizen's "rights, privileges, or immunities secured by the Constitution and laws" of the United States. In order to state a claim under 42 U.S.C. § 1983, plaintiff must allege that the defendant acted under color of state law and that he violated a right secured by the Constitution. *West v. Atkins*, 487 U.S. 42 (1988); *Dunham v. Wadley*, 195 F.3d 1007, 1009 (8th Cir.1999). The deprivation must be intentional; mere negligence will not suffice to state a claim for deprivation of a constitutional right under § 1983. *Daniels v. Williams*, 474 U.S. 327 (1986); *Davidson v. Cannon*, 474 U.S. 344 (1986).

### A. Aramark Defendants' Motion for Summary Judgment (Doc. 88)

The Aramark Defendants present the following arguments in favor of their Summary Judgment Motion: (1) Plaintiff's claims concerning extortionistic pricing at the commissary fail as a matter of law; (2) the ADTPA does not apply to detainees in a county detention center; (3) Plaintiff's claim regarding the failure to use a heated cart or "hot box" to serve food is barred by the physical injury requirement of the Prison Litigation Reform Act ("PLRA"); (4) Plaintiff's claims regarding the adequacy of the diet fail; and (5) Plaintiff's claims under § 1983 fail because Aramark did not act under color of state law.

### 1. Inflated or Exorbitant Commissary Prices

There is no constitutional right to access to a commissary. *Tokar v. Armontrout*, 97 F.3d 1078, 1083 (8th Cir. 1996). Nor is there a constitutional right to purchase items at the price it would cost to obtain the items in the free world. *See DeBrew v. Atwood*, 792 F.3d 118, 129 (D.C. Cir. 2015) (noting that Eighth Amendment "does not guarantee the

right of an inmate to purchase a good or service at a particular price") (citation omitted). Thus, even if Plaintiff was charged exorbitant amounts for commissary items, no constitutional claim is stated.

The Aramark Defendants are entitled to summary judgment on this claim.

## 2. ADTPA Claim

Plaintiff argues that Aramark, in conjunction with the WCDC, is violating the ADTPA, Ark. Code Ann. § 4-88-101 *et seq.,* by serving smaller food portions to inmates on commissary-order days in order to drive up commissary sales and profits. Plaintiff alleges that hungry detainees are forced to purchase commissary items or starve. Specifically, Plaintiff maintains that Aramark engages in a deceptive trade practice by "[k]nowingly taking advantage of a consumer who is reasonably unable to protect his or her interest because of: (A) Physical Infirmity; (B) Ignorance; (C) Illiteracy; (D) Inability to understand the language of the agreement; or (E) A similar factor." Ark. Code Ann. § 4-88-107(a)(8)(A)-(E). Plaintiff contends prisoners are at a particular disadvantage and easily taken advantage of since they have no other means of obtaining these products.

Aramark asserts that it is unaware of any authority applying the ADTPA to a claim by a detainee at a county detention center. Moreover, it notes the ADTPA excepts actions or transactions that are governed by state agencies. Ark. Code Ann. § 4-88-101. Specifically, the ADTPA exempts:

> Actions or transactions permitted under laws administered by the Insurance Commissioner, the Securities Commissioner, the State Highway Commission, the Bank Commissioner, or other regulatory body or officer acting under statutory authority of this state or the United States, unless a director of these divisions specifically requests the Attorney General to implement the powers of this chapter.

19

Ark. Code Ann. § 4-88-101(3). Aramark further asserts that its services at the WCDC are subject to the oversight of, and operate under laws administered by, the Criminal Detention Facilities Review Committee of the Arkansas Department of Finance and Administration.

Recently, this Court was faced with a virtually identical ADTPA claim in *Avery v. Helder, et al.,* Case No. 5:16-cv-05169. There, the Court declined to retain supplemental jurisdiction over the ADTPA claim, finding that it presented a novel or complex issue of state law. *See* 28 U.S.C. § 1367(c)(1) (court may decline to exercise supplemental jurisdiction over a claim where a novel or complex issue of state law is presented). In doing so, the Court noted that both the application of the ADTPA to prisoners and the possible application of the exemption were questions not addressed by the Arkansas courts. Further, a survey of state courts indicated that few, if any, courts have addressed this particular issue. *See Avery v. Helder, et al.,* Case No. 5:16-cv-05169, Doc.154, *adopted as to ADTPA claim in* 2017 WL 4163663, at *10 (W.D. Ark. Sept. 20, 2017).

The Court believes the same course of action should be taken in this case and therefore declines to exercise supplemental jurisdiction over the ADTPA claim.

### 3. Adequacy of Diet and Food Handling

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 851 (1998) (citation omitted). The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994).

The Eighth Amendment's prohibition against cruel and unusual punishment is

violated if an inmate is not provided with meals adequate to maintain his health. *See, e.g.,* *Keenan v. Hall*, 83 F.3d 1083, 1091 (9th Cir. 1996); *Campbell v. Cauthron*, 623 F.2d 503, 508 (8th Cir. 1980) (prisoners are guaranteed a reasonably adequate diet). "The deprivation of food constitutes cruel and unusual punishment only if it denies a prisoner the 'minimal civilized measure of life's necessities.'" *Talib v. Gilley*, 138 F.3d 211, 214 n.3 (5th Cir. 1998) (expressing doubt that Talib, who missed about fifty meals in five months and lost fifteen pounds, met this threshold) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). "Whether the deprivation of food falls below this threshold depends on the amount and duration of the deprivation." *Green v. Ferrell*, 801 F.2d 765, 770 (5th Cir. 1986).

An Eighth Amendment claim has both an objective and subjective component. *Farmer*, 511 U.S. at 834. The objective component "tests whether, viewed objectively, the deprivation of rights was sufficiently serious." *Irving v. Dormire*, 519 F.3d 441, 446 (8th Cir. 2008). The subjective component "requires that the inmate prove that the prison officials had a 'sufficiently culpable state of mind.'" *Id.* (quoting *Farmer*, 511 U.S. at 834). In claims involving allegations of an inadequate diet, the subjective component requires the plaintiff to show that the defendants were deliberately indifferent to his dietary needs. *Wishon v. Gammon*, 978 F.2d 446, 449 (8th Cir. 1992). The availability of supplementary food through commissary purchases "must not be considered part of the jail diet for purposes of determining its constitutionality because some of the inmates have no money to purchase these items. Moreover, the state is under a duty to provide an adequate diet for all inmates." *Campbell* , 623 F.2d at 508 n.5.

The summary judgment record, when viewed in the light most favorable to Plaintiff, shows that he was 6'1" and 242 pounds when he was booked into the jail on June 24, 2016 (Doc. 99-2, p. 1); 245 pounds when he was booked at the Madison County Sheriff's Office on July 11, 2016, *id.* at 17; 234 pounds on August 18, 2016 (Doc. 90-1, p. 9); 215.5 pounds on September 16, 2016 (Doc. 99-3, p. 34); and 214 pounds on November 18, 2016 (Doc. 99-3, p. 41). Plaintiff believes he lost even more weight after that and contends that he weighed 206 pounds when he transferred from the WCDC to the ADC. (Doc. 123, p. 4). Although the exact date of transfer is not noted in the record, Plaintiff filed a notice of change of address with the Court on January 9, 2017, advising that he was now housed at the ADC.

In total, Plaintiff has alleged a 36-pound weight loss over the course of approximately six months. While the Constitution certainly does not permit the "incremental starvation" of inmates, *George v. King*, 837 F.2d 705, 707 (5th Cir. 1988), it is also true that the weight loss must be considered in context. *See, e.g., Giddings v. Cradduck*, 2017 WL 2791345, at *6 (W.D. Ark. June 6, 2017) (loss of 70 pounds over a few days short of one year insufficient to create genuine issue of material fact where Plaintiff was obese both when he entered the detention center and when he was released), *adopted by* 2017 WL 2799297, at *1 (W.D. Ark. June 27, 2017); *Whitney v. Morse*, 2016 WL 908268, *7-8 (W.D. Ark. Feb. 4, 2016) (loss of 23 pounds over a six-month period, where plaintiff still weighed more than recommended weight for his height, insufficient to show Eighth Amendment violation in the absence of evidence that plaintiff became ill, suffered any other adverse physical effects, or was denied nutritionally and calorically

22

adequate diet), *adopted by* 2016 WL 894695, at *1 (W.D. Ark. March 8, 2016), *aff'd on appeal*, 698 Fed. Appx. 319 (8th Cir. 2017) (per curiam); *Ahlers v. Kaskiw*, 2014 WL 4184752, at *9 (N.D.N.Y. Aug. 21, 2014) (loss of 66 pounds over more than four years deemed a "gradual transformation from obesity to a healthy body weight" and "[did] not satisfy the objective prong of the deliberate indifference standard"); *Evans v. Albany Cnty. Corr. Facility*, 2009 WL 1401645, at *10 (N.D.N.Y. May 14, 2009) (even assuming plaintiff lost 30 pounds and experienced dizziness and headaches over a four-month period, no evidence existed to support Eighth Amendment violation).

Plaintiff asserts that Karas medical staff recognized that there were problems with the WCDC's meal plan because Plaintiff was prescribed prenatal vitamins at some point. (Doc. 123, p. 5). However, there are many reasons why an individual would take, or need to take, vitamin or mineral supplements. Without more, the mere fact that Plaintiff was prescribed prenatal vitamins during his incarceration does not create a genuine, material dispute of fact as to whether his diet was so insufficient that it rose to an Eighth Amendment violation.

The Court is similarly unconvinced that Plaintiff was wrongly denied a special diet or larger portions of food. The summary judgment record establishes that the authority to order changes to a prisoner's diet was vested in the medical care provider, and not in Aramark. As the Aramark Defendants accurately point out by referencing the Body Mass Index ("BMI"), Plaintiff was obese when he entered the WCDC and still overweight when he was released to the ADC. Plaintiff criticizes the use of the BMI to determine whether or not he was overweight. He contends it does not adequately consider factors such as

23

body type, and he describes himself as having had a "muscular build" when he first entered WCDC custody. While the National Institute of Health recognizes that the BMI index "may overestimate body fat in athletes and others who have a muscular build," the BMI index is still utilized by both the National Institute of Health and the Mayo Clinic as a "useful measure of overweight and obesity." https://www.nhlbi.nih.gov/health/educational/lose_wt/risk.htm (accessed January 11, 2018); *see also* https://www.mayoclinic.org/diseases-conditions/obesity/symptoms-causes/syc-20375742 (accessed January 11, 2018). According to the BMI index, Plaintiff at 242 pounds had a BMI of 32, and at 206 pounds had a BMI of 27. A BMI of 30 or above is considered obese and a BMI of 25 to 29.9 is considered overweight. *See* https://www.nhlbi.nih.gov/health/educational/lose_wt/risk.htm (accessed January 11, 2018).

According to the NIH, "[w]eight can be lost at a rate of 1 to 2 lb/week with a calorie deficit of 500 to 1,000 kcal/day." *See* https://www.nhlbi.nih.gov/health-pro/guidelines/current/obesity-guidelines/e_textbook/txgd/4311.htm (accessed January 11, 2018). In attaining a healthy weight, the NIH recommends a weight loss of "1 to 2 lb/week for a period of 6 months." *Id.* Given Plaintiff's testimony that he ate a minimum of 3,000 calories a day prior to his incarceration, his weight loss of 36 pounds over approximately six months does not suggest the existence of a genuine issue of material fact as to the whether the diet Plaintiff received was so inadequate that it violated the Eighth Amendment.

The claim also merits dismissal because Plaintiff has failed to establish any genuine, material dispute of fact as to the "subjective component" of the claim, in that he

24

has presented no evidence to show that prison officials were deliberately indifferent to his dietary needs. As previously mentioned, he was fed a 3,000 calorie-a-day diet, as all inmates were, and he does not allege that he was given less food than other inmates, or that he was intentionally deprived of normal food portions.

Turning now to Plaintiff's claim concerning food service in the pods, his contention that the food should have been kept in a "hot box" rather than on flat carts is clearly inadequate to establish an Eighth Amendment violation. Plaintiff alleges that occasionally there was a delay in food service when the trays of food were left in the hallways between pods prior to distribution. Plaintiff has not alleged that these delays impacted the nutritional value of the food or caused the food to be spoiled or inedible. Clearly, this practice by the jail did not result in Plaintiff being deprived of the "minimal civilized measure of life's necessities." *Wilson*, 501 U.S. at 298. For these reasons, The Aramark Defendants are entitled to summary judgment on this claim.[8]

### B. Washington County Defendants' Motion for Summary Judgment (Doc. 97)

The Washington County Defendants move for summary judgment on the following grounds: (1) there is no proof of any personal involvement on the part of Sheriff Helder or Major Denzer in any of Plaintiff's claims; (2) Plaintiff was not denied adequate nutrition; (3) Plaintiff has no right to a grievance process; (4) there was no violation of the ADTPA; (5) Plaintiff was not entitled to particular housing or a particular classification; (6) Plaintiff was

---

[8] The Aramark Defendants also present the argument that they did not act under color of law. Having granted them summary judgment on Plaintiff's federal law claims, it is unnecessary for the Court to address this issue. However, in previous cases, the Court has rejected this particular argument. *See, e.g., Whitney v. Morse*, 2014 WL 7339140, at *4 (W.D. Ark. Dec. 23, 2014).

not denied access to the courts; (7) Plaintiff was not denied access to media; (8) the Karas Defendants were not deliberately indifferent to Plaintiff's serious medical needs; (9) Defendants are entitled to qualified immunity; and (10) there is no basis for official-capacity liability.

### 1. Personal Involvement of Sheriff Helder and Randall Denzer

Plaintiff contends Sheriff Helder and Major Denzer are liable for constitutional violations because they had the authority at any time to step in and put an end to the violations. According to Plaintiff, Helder and Denzer created the jail's policies and procedures and had "total control over the W.C.D.C. and issues within." (Doc. 123, p. 2). Plaintiff suggests that the jail is the "equivalent of their 'company,'" *id.* at 3, and that Plaintiff specifically asked that his grievances be sent up the chain of command. For their part, Helder and Denzer argue that Plaintiff has failed to prove, or even adequately allege, that they had any personal involvement in the alleged violations of his constitutional rights.

A claim regarding the deprivation of a constitutional right cannot be based on a *respondeat superior* theory of liability. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 654, 694 (1978). "[A] supervisor is not vicariously liable under 42 U.S.C. § 1983 for an employee's unconstitutional activity." *White v. Holmes*, 21 F.3d 277, 280 (8th Cir. 1994); *see also Whitson v. Stone Cnty. Jail*, 602 F.3d 920, 928 (8th Cir. 2010) ("In a § 1983 case, an official is only liable for his own misconduct and is not accountable for the misdeeds of his agents under a theory such as respondeat superior or supervisor liability.") (internal quotations omitted); *Keeper v. King*, 130 F.3d 1309, 1314 (8th Cir. 1997) (finding that "general responsibility for supervising the operations of a prison is insufficient to establish

26

the personal involvement required to support liability").

"Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights. To establish personal liability of the supervisory defendant, [Plaintiff] must allege specific facts of personal involvement in, or direct responsibility for, a deprivation of his constitutional rights." *Clemmons v. Armontrout*, 477 F.3d 962, 967 (8th Cir. 2007) (quoting *Mayorga v. Mo.*, 442 F.3d 1128, 1132 (8th Cir. 2006)). Here, Plaintiff has not alleged that Sheriff Helder or Major Denzer was personally involved in any of the alleged unconstitutional conduct he complains of—with the exception of Plaintiff's First Amendment claim concerning access to news and other media. In particular, Plaintiff relies on a *respondeat superior* theory of liability that imputes knowledge of his dietary, medical, and housing claims to Helder and Denzer simply because they are in charge of the WCDC. Plaintiff does not allege that he communicated with either Sheriff Helder or Major Denzer about his diet, medical care, or housing, and Plaintiff does not offer any evidence that either Defendant actually made decisions about his diet, medical care, or housing.

However, with respect to Plaintiff's First Amendment claim, there appears to be evidence that both Helder and Denzer were personally involved in the decision to deny inmates—including Plaintiff—access to newspapers or magazines in the general population area of the jail. There remains a genuine, material question of fact as to whether the satellite radio stations that were played in the general population area provided an adequate source of news, sufficient to pass constitutional muster. Accordingly, Sheriff Helder and Major Denzer are entitled to summary judgment on all individual-capacity

claims, except for Plaintiff's First Amendment claim.

## 2. Adequate Nutrition

The Court has already addressed this claim in connection with the Aramark Defendants. The Washington County Defendants are also entitled to summary judgment on this claim for the same reasons discussed above.

## 3. Grievance Process

Plaintiff contends the grievance procedure is flawed in a number of ways including that the jail provides inadequate responses, fails to investigate issues raised in grievances, fails to pass grievances up the chain of command, and leaves grievances open for such long periods of time that inmates are prevented from submitting new electronic grievances. Plaintiff also argues that the Washington County Defendants are liable as to all aspects of his Complaint by virtue of their failure to adequately investigate and address the issues raised in his written grievances.

In response, the Washington County Defendants point out that Plaintiff received written responses to his multiple grievances, and he even appealed certain grievances. They also argue, correctly, that there is no constitutionally protected right to a grievance procedure. *See, e.g., Lombolt v. Holder*, 287 F.3d 683, 684 (8th Cir. 2002) (denial of grievances does not state a substantive constitutional claim); *see also Ashann-Ra v. Commonwealth of Va.*, 112 F. Supp. 2d 559, 569 (W.D. Va. 2000). Even though the Washington County Defendants put a grievance procedure in place, "no constitutional right was violated by the defendants' failure, if any, to process all of the grievances [Plaintiff] submitted for consideration." *Buckley v. Barlow*, 997 F.2d 494, 495 (8th Cir. 1993).

Further, "[w]hen the claim underlying the administrative grievances involves a constitutional right, the prisoner's right to petition the government for redress is the right of access to the courts, which is not compromised by the prison's refusal to entertain his grievance." *Flick v. Alba*, 932 F.2d 728, 729 (8th Cir. 1991).

Plaintiff has not identified a federal constitutional right that he was deprived of because of the alleged inadequacies in the grievance procedure. He makes no argument that he was treated differently from other similarly situated prisoners, or that his grievances were ignored because he was exercising his constitutional rights. Further, he does not contend that his ability to exercise any specific constitutional right was chilled due to the responses—or lack thereof—to his written grievances. For these reasons, the Washington County Defendants are entitled to summary judgment on this claim.

#### 4. ADTPA Claim

As explained above, the Court has declined to retain supplemental jurisdiction over this claim.

#### 5. Housing Misclassification

Plaintiff contends that he was wrongly assigned to live on the A side of the jail with the violent offenders, despite the fact that he had no conviction or charges for violent crimes. He claims that because he was housed in A side, he was forced to detox on a concrete floor instead of a bunk, since A side inmates are not permitted to access their bunks during the day. Further, due to the violent nature of the detainees in A side, Plaintiff claims he was involved in numerous altercations and sustained injuries as a result. He believes he should have been housed in B side with other non-violent offenders. He also

29

argues that B side inmates had significantly more rights and freedoms than A side inmates. Because he was placed wrongly in A side, he was treated differently than other similarly situated inmates.

The Washington County Defendants explain in their briefing on summary judgment that the classification system at the WCDC considers a number of factors, including the inmate's criminal history, current charges, in-jail behavior, available space, and threats made by or against other inmates. Defendants claim it is possible for a detainee to be classified one way during one period of incarceration, and a different way during a subsequent period of incarceration. Inmates may be re-classified depending on the resolution of charges pending against them, or because of additional information that the jail receives regarding their charges.

The Washington County Defendants deny that Plaintiff's rights were violated by the way he was classified. First, they point out that a prisoner has no constitutional right to a particular classification. *Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976). Thus, when a claim "merely reflect[s] an administrative classification issue . . . the inquiry of the federal courts into prison management must be limited to the issue of whether a particular system violated any prohibitions of the Constitution." *Peck v. Hoff*, 660 F.2d 371, 373 (8th Cir. 1981).

To establish an Equal Protection claim, Plaintiff must demonstrate that he was treated differently than other similarly situated inmates based on a suspect classification or a fundamental right. *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 815-16 (8th Cir. 2008). "[T]he initial inquiry in analyzing an equal protection claim is to determine whether a person is similarly situated to those persons who allegedly receive favorable treatment."

*United States v. Whiton*, 48 F.3d 356, 358 (8th Cir. 1995).

In examining the summary judgment record in the light most favorable to Plaintiff, the Court finds that he has failed to raise a genuine, material dispute of fact, suitable for trial, that he was similarly situated to those inmates housed on the B side. Plaintiff merely alleges he had not committed any violent offenses prior to his initial classification. He does not address any of the other factors that are utilized in the classification process. Further, there is no suggestion in the record that Plaintiff's housing classification was based on a suspect classification or a fundamental right. Plaintiff has not alleged that his classification as a violent offender was based on an unconstitutional reason, such as retaliation for the exercise of a First Amendment right. The fact that Plaintiff was later reclassified and moved to another location in the jail does nothing to establish that his initial classification violated the Constitution. Accordingly, summary judgment will be granted in the Washington County Defendants' favor on this claim.

### 6. Access to the Courts

Plaintiff contends he was denied access to a law library despite having both criminal and civil cases pending. He asserts that he tried numerous times to obtain a court order through the Madison County Circuit Court and the Washington County Circuit Court so that he could be transported from the jail to the library, but all requests were ignored. Further, he claims he was told—erroneously—by the public defender's office that there was no law library for detainees to use even if a court order was obtained.

The Supreme Court has held "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of

31

meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds v. Smith*, 430 U.S. 817, 828 (1977) Nevertheless, *Bounds* "did not create an abstract, freestanding right to a law library or legal assistance." *Lewis v. Casey*, 518 U.S. 343, 351 (1996). Instead, prison officials must provide inmates with "meaningful access to the courts," *Bounds*, 430 U.S. at 824, and providing a law library is merely one way to comply with this obligation. *See Bear v. Fayram*, 650 F.3d 1120, 1123 (8th Cir. 2011) (holding that the constitutional requirement of access to the courts may be satisfied in a number of ways including prison libraries, jailhouse lawyers, private lawyers on contract with the prison, or some combination of these and other methods).

An inmate has no standing to pursue a lack-of-access claim unless he can demonstrate that he suffered prejudice or actual injury as a result of prison officials' conduct. *See Lewis*, 518 U.S. at 351-2; *see also Farver v. Vilches*, 155 F.3d 978, 979-980 (8th Cir.1998) (per curiam); *Klinger v. Dep't of Corr.*, 107 F.3d 609, 617 (8th Cir.1997) (to prevail on access-to-courts claim, inmate must show actual injury or prejudice even if denial of access to library is complete and systematic). Thus, "[t]o prove a violation of the right of meaningful access to the courts, a prisoner must establish the state has not provided an opportunity to litigate a claim challenging the prisoner's sentence or conditions of confinement in a court of law, which resulted in actual injury, that is, the hindrance of a nonfrivolous and arguably meritorious underlying legal claim.'" *Hartsfield v. Nichols*, 511 F.3d 826, 831 (8th Cir. 2008) (citations omitted).

Plaintiff claims he was harmed due to the lack of a law library at the WCDC in the

following ways: (1) he was unable to participate in a Department of Human Services case regarding the custody of his son because he did not have access to "juvenile law"; (2) he was unable to fight the civil forfeiture of his vehicle; and (3) his civil rights case, *Emery v. Hyslip*, was dismissed because of his lack of legal knowledge and lack of resources. The first two cases do not involve a challenge to his sentence or his conditions of confinement and do not fall under the protections of *Lewis* or *Bounds*. The civil rights case he references, *Emery v. Hyslip, et al.,* Case No. 5:15-cv-05277 (W.D. Ark. Dec. 7, 2016), was dismissed because the named defendants were public defenders who were not subject to suit under § 1983. Library access or additional resources would not have cured this deficiency. Additionally, the case involved alleged ethical violations of the public-defender defendants, and not complaints about Plaintiff's sentence or his conditions of confinement. Accordingly, Plaintiff has failed to show an actual injury as to this claim, and the Washington County Defendants are entitled to summary judgment.

### 7. Access to the Media

Plaintiff contends he was denied access to any local, state, national, or world news while confined at the WCDC. He maintains the radio stations playing in the pod were difficult to hear, and the programming consisted only of talk radio discussing various viewpoints. Further, he maintains that the alleged reason for depriving detainees of access to newspapers is not a sufficiently valid reason, as there are plenty of other materials in the pods that could be used to clog toilets, start fires, cover lights, or cause fights, including letters, books, legal materials, mats, and clothing.

The Washington County Defendants respond that the restriction on newspapers in

33

the general population area of the jail is based on a legitimate governmental objective. They explain that the restriction was put in place because of constant problems with damage to the facilities caused by inmates hoarding newspapers, fighting over them, or using them to clog toilets and start fires. In recognition of the need to provide inmates access to a source of news or information, the WCDC subscribed to several satellite radio stations and played those stations during the daytime hours. The stations were intermittently changed, and the Washington County Defendants represent that the programming provided "discussions of news topics and viewpoints." (Doc. 98, p. 25).

Supreme Court law is well established that "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989). "[A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1972). Among other things, the "Constitution protects the rights to receive information and ideas." *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972).

Prison policies impinging on inmates' First Amendment rights are valid only if they are reasonably related to legitimate penological interests. *Turner v. Safley*, 482 U.S. 78, 89-90 (1987); *Cooper v. Schriro*, 189 F.3d 781, 784 (8th Cir. 1999). "[E]ven though this court engages in a deferential review of the administrative decisions of prison authorities, the traditional deference does not mean that courts have abdicated their duty to protect those constitutional rights that a prisoner retains." *Fortner v. Thomas*, 983 F.2d 1024, 1029 (11th Cir. 1993).

34

In determining whether a regulation or restriction is reasonable, the court employs a balancing test that considers the following: (1) whether a rational connection exists between the regulation and a neutral, legitimate government interest; (2) whether alternative means exist for inmates to exercise the constitutional right at issue; (3) what impact the accommodation of the right would have on inmates, prison personnel, and allocation of prison resources; and (4) whether obvious, easy alternatives exist. *Dawson v. Scurr*, 986 F.2d 257, 260 (8th Cir. 1993) (citing *Turner*, 482 U.S. at 89-91).

Generally, an absolute ban on inmate access to newspapers and magazines violates the First Amendment because it is considered an exaggerated response to legitimate penological needs. *Mann v. Smith*, 796 F.2d 79, 82 (5th Cir. 1986). Furthermore, a number of courts have held that prisoners have a right to receive and read newspapers. *See, e.g, Sizemore v. Williford*, 829 F.2d 608, 610 (7th Cir. 1987) (absent restrictions based on legitimate goals of confinement, prison inmates retain First Amendment right to receive and read newspapers). Nevertheless, certain restrictions on access to newspapers and magazines have been recognized as valid. *See Beard v. Banks*, 548 U.S. 521, 530 (2006) (prison's policy of restricting access to newspapers, magazines, and photographs to inmates placed in most restrictive level of prison's long-term segregation unit was justified by the need to provide particularly difficult prisoners with increased incentives for better prison behavior, the need to minimize the amount of property they control in their cells, and the need to ensure prison safety).

Here, the Washington County Defendants rely on security and safety concerns to support their complete ban on newspapers in the jail's general population. According to

Plaintiff, inmates are permitted access to books, letters, envelopes and numerous other materials that could also be used to clog the plumbing or start fires. In other words, inmates have access to a whole host of items that would appear to present the same security and safety concerns as access to newspapers.

"Courts have recognized the tenuousness of the connection between [a prohibition on magazines and newspapers] and fire prevention." *Spellman v. Hopper*, 95 F. Supp. 2d 1267, 1273 (M.D. Ala. 1999); *see also Kincaid v. Rusk*, 670 F.2d 737, 744 (7th Cir. 1982) ("[T]he total ban on newspapers was arbitrary and unjustifiable when the two hazards allegedly caused by the possession of newspapers—fire damage and jammed plumbing—could as well be caused by the sort of reading material detainees were permitted to have."); *Payne v. Whitmore*, 325 F. Supp. 1191, 1193 (N.D. Cal. 1971) ("Jail cells are already filled with an abundance of materials quite suitable for fire starting . . . ; yet no one suggests that cells ought to be stripped of bedding, clothing, toilet paper, writing materials, and so on."). Here, the Washington County Defendants have submitted no supporting evidence concerning the frequency of fires or problems with clogged plumbing—either before the newspaper ban was put in place, or after it was put in place.

The Court therefore finds that there are genuine issues of material fact that preclude summary judgment in the Washington County Defendants' favor on this claim. It is clear that Plaintiff was denied access to newspapers and magazines. While the Washington County Defendants have asserted a legitimate penological reason for denying inmates access to these materials, they allow inmates access to other materials that create the same hazards they seek to avoid. There is no explanation for this contradiction in the record.

Additionally, although Plaintiff may have had some access to the radio, there remain questions as to the quality of the access. Did Plaintiff, for example, have access to state, local, national, and world news? Or did he only have access to the opinions of individuals offering their viewpoints on issues of the day? Further, there is a material question of fact as to whether the radio is considered a satisfactory alternative for newspapers and magazines in the first place. *See, e.g., Jacklovich v. Simmons*, 392 F.3d 420, 431 (10th Cir. 2004) ("Concerning the inmates' other alternative means to exercise their First Amendment rights, we agree that the ability to listen to the radio or watch television is not an adequate substitute for reading newspapers and magazines.") (citations omitted).

In considering the scope of this First Amendment claim, the Court finds that genuine issues of material fact exist only as to the liability of Sheriff Helder and Major Denzer. The summary judgment record contains evidence that they are the only individuals who could potentially be responsible for putting the ban in place. The remaining Washington County Defendants are therefore entitled to summary judgment on this claim.

### 8. Medical Care

Plaintiff does not dispute that all medical decisions in the WCDC are made by Dr. Karas or his staff. Prison officials violate a prisoner's right to medical care if their conduct amounts to "deliberate indifference to [the prisoner's] serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 108 (1976). "Deliberate indifference" on the part of prison officials requires a "sufficiently culpable state of mind. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). "[T]he prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not give rise to the level

37

of a constitutional violation. Deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct." *Popoalii v. Corr. Med. Servs.*, 512 F.3d 488, 499 (8th Cir. 2008) (internal quotation marks and citations omitted).

The first medical claim Plaintiff makes concerns his diet. The Court cross-references the previous discussion in this Opinion concerning Plaintiff's BMI, see *supra* Section III.A.3, in which it noted that at the time Plaintiff entered WCDC custody, his BMI of 32 was considered "obese," and his final BMI of 27 once he left the facility was still considered "overweight." *See* https://www.nhlbi.nih.gov/health/educational/lose_wt/risk.htm (accessed January 11, 2018). Accordingly, any medical requests he might have made for extra portions of food or a special diet were properly denied by the medical staff. There is no dispute that the staff monitored Plaintiff's weight routinely, and that Plaintiff never dropped below a medically acceptable, healthy weight during his time at the WCDC. Therefore, there is no genuine, material dispute of fact that Plaintiff's weight loss amounted to a serious medical need, and this claim will be dismissed.

Plaintiff also claims that the medical staff were deliberately indifferent to his serious medical condition of high blood pressure when they intentionally caused delay in administering his medication. The evidence is undisputed that the nursing staff verified his blood pressure prescriptions on the same day he was booked in the jail, and the doctor cleared him to begin receiving two blood pressure medications the following day. Even if the Court assumes Plaintiff is right and there were a handful of days in which his blood pressure medication failed to appear on the medical cart, he has failed to set forth any facts to show that he suffered an actual injury as a result, or that the omissions were intentional, rather than negligent. *See Holden v. Hirner*, 663 F. 3d 336, 342 (8th Cir. 2011)

("A prisoner alleging a delay in treatment must present verifying medical evidence that the prison officials ignored an acute or escalating situation or that [these] delays adversely affected his prognosis.") (internal quotation marks and citation omitted).[9]

Plaintiff's final medical claim concerns his detoxification from methamphetamine. The evidence is undisputed that jail and medical officials were made aware on the day of initial booking that he had been taking methamphetamine and opioids for a long period of time and would be detoxifying off those drugs while in the WCDC. *See* Doc. 99-3, p. 9. The jail medical logs note that during the five-day detox period, Plaintiff reported shaking, not feeling well, feeling sick to his stomach, sweating, and headaches. (Doc. 99-3, pp. 56-57). He was given Naproxen for pain. It appears Plaintiff believes some other medical treatment should have been prescribed while he was in detox, though the Court is unsure what he would suggest. The fact is that he did not suffer any medically significant or long-term injury as a result of the jail's medical procedures surrounding his detox. Accordingly, there is no evidence that medical personnel were deliberately indifferent to a serious medical need related to his detoxification. All medical-care claims are dismissed.

### 9. Qualified Immunity

The only substantive claims that will survive summary judgment are the individual-

---

[9] Plaintiff also references in a Supplement (Doc. 83, p. 1) an incident during which he was transported to court in a different county without his blood pressure medication. He blames Nurse R. Walker for denying his request to take his medication with him, and Sergeant Ake, who was also present, but did nothing to help Plaintiff obtain his medication. There is nothing in the record to suggest that Sergeant Ake had the authority to countermand a decision made by a nurse, so he is not liable for this claim. As for Nurse Walker, Plaintiff failed to present any medical evidence that he suffered a detrimental health effect as a result of not receiving his blood pressure medication. She is also not liable for this claim.

and official-capacity claims against Sheriff Helder and Major Denzer, regarding Plaintiff's alleged denial of access to local, state, and world news. The Court now addresses whether either Defendant may be entitled to qualified immunity as to one or both of the claims against them.

"Government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 343, 341 (1986)). This inquiry is normally one of pure law. *J.H.H. v. O'Hara*, 878 F.2d 240 (8th Cir. 1989).

To survive a summary judgment motion on qualified immunity grounds, a plaintiff must establish there is a genuine issue of material fact as to whether the defendants violated his clearly established constitutional rights. *Habiger v. Fargo*, 80 F.3d 289 (8th Cir. 1996). As noted earlier, the Constitution "protects the rights [of inmates] to receive information and ideas." *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972). Absent restrictions based on legitimate goals of confinement, prison inmates retain their First Amendment right to read newspapers. The law is clearly established that an absolute ban on newspapers is upheld only under limited circumstances. *See, e.g., Hutchings v. Corum*, 501 F. Supp. 1276, 1299 (W.D. Mo. 1980) (absolute denial of access to newspapers violates inmates' First Amendment guarantees); *Hall v. Phillips*, 2005 WL 3783651, at *7

40

(W.D. Ark. Nov. 22, 2005), *adopted by* 2005 WL 37989233, at *1 (W.D. Ark. Dec. 14, 2005).

As discussed above, Plaintiff contends that he had no access to local, state, national, or world news while housed in the general population of the WCDC. He further maintains that the radio stations selected by the WCDC were difficult to hear and only provided opinion or viewpoint discussions and not news reports. He has therefore alleged a genuine issue of material fact that Sheriff Helder and Major Denzer violated a clearly established constitutional right. Qualified immunity on Plaintiff's First Amendment news media claim is denied.

### 10. Official-Capacity Liability

With respect to the official-capacity claims, they are "functionally equivalent to a suit against the employing governmental entity." *Veatch v. Bartels Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010). In other words, the official-capacity claims are treated as claims against Washington County. *See Murray v. Lene*, 595 F.3d 868, 873 (8th Cir. 2010).

"[I]t is well established that a municipality cannot be held liable on a *respondeat superior* theory, that is, solely because it employs a tortfeasor." *Atkinson v. City of Mountain View, Mo.,* 709 F.3d 1201, 1214 (8th Cir. 2013). To establish Washington County's liability under § 1983, "plaintiff must show that a constitutional violation was committed pursuant to an official custom, policy, or practice of the governmental entity." *Moyle v. Anderson*, 571 F.3d 814, 817 (8th Cir. 2009) (citation omitted). The applicable law has been summarized as follows:

There are two basic circumstances under which municipal liability will attach: (1) where a particular municipal policy or custom itself violates federal law, or directs an employee to do so; and (2) where a facially lawful municipal policy or custom was adopted with "deliberate indifference" to its known or obvious consequences. *Seymour v. City of Des Moines*, 519 F.3d 790, 800 (8th Cir. 2008). There need not be a finding that a municipal employee is liable in his or her individual capacity before municipal liability can attach. *Speer v. City of Wynne*, 276 F.3d 980 (8th Cir. 2002); *Parrish v. Luckie*, 963 F.2d 201, 207 (8th Cir. 1992) ("A public entity or supervisory official may be held liable under § 1983 even though no government individuals were personally liable."). Where an official policy is itself unconstitutional or directs employees to take unconstitutional action, no evidence beyond a statement of the policy and its exercise is necessary to establish § 1983 liability. *Szabla v. City of Brooklyn Park*, 486 F.3d 385, 389-90 (8th Cir. 2007).

*Id*. at 817-18.

Here, the only official-capacity liability claim that remains at issue concerns the WCDC's news media policy. It is undisputed that Plaintiff did not have access to newspapers or other written media, and the Court has determined that a genuine, material dispute of fact exists as to whether this policy implemented by the County was unconstitutional. With respect to Plaintiff's other claims, however, he has failed to show the existence of any unconstitutional custom or policy. Therefore, the Washington County Defendants are entitled to summary judgment on all official-capacity claims, except for the First Amendment newspaper and news media claim,.

## IV. CONCLUSION

For the reasons stated above, **IT IS ORDERED** that the Motion for Summary Judgment filed by the Aramark Defendants (Doc. 88) is **GRANTED**. All claims against Aramark Correctional Services, LLC, Tommy Roark, Tina Webb, Jessie England, and Carla Cink, under 42 U.S.C. § 1983, are **DISMISSED WITH PREJUDICE**, with the

exception of Plaintiff's state law claim arising under the Arkansas Deceptive Trade Practices Act. 28 U.S.C. § 1367(c)(1). The Court declines to retain supplemental jurisdiction over Arkansas Deceptive Trade Practices Act claim, and it is therefore **DISMISSED WITHOUT PREJUDICE**.

**IT IS FURTHER ORDERED** that the Motion for Summary Judgment filed by the Washington County Defendants (Doc. 97) is **GRANTED IN PART AND DENIED IN PART**. Specifically, the Motion is **GRANTED** with respect to the following § 1983 claims: the inadequate diet claim; the inadequate grievance procedure claim; the housing classification claim; the access to the courts claim; and the denial of adequate medical care claim. These claims are **DISMISSED WITH PREJUDICE.** The Court declines to exercise supplemental jurisdiction over the claim arising under the Arkansas Deceptive Trade Practices Act, 28 U.S.C. § 1367(c)(1), and it is **DISMISSED WITHOUT PREJUDICE**. The Motion is **DENIED** as to Plaintiff's First Amendment claim involving access to newspapers and news media, against Sheriff Helder and Major Denzer in their individual and official capacities. This claim will be preserved for trial.

The Court intends to issue a final scheduling order and set a trial date in the near future.

**IT IS SO ORDERED** on this __5th__ day of February, 2018.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE